IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jamarcus McIlwain,<br><br>            Plaintiff,<br><br>    vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>            Defendant. | Civil Action No. 6:11-2324-MGL-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on April 18, 2005, alleging that he became unable to work on August 15, 1995. The applications were denied initially and on reconsideration by the Social Security Administration. On January 6, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff appeared on March 4, 2008, considered the case *de novo*, and on April 23, 2008, found

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

that the plaintiff was not under a disability as defined in the Social Security Act. On December 22, 2008, the Appeals Council issued an order remanding the case back to the ALJ directing the ALJ to (1) reconsider all of the relevant medical evidence and, in particular, the opinion evidence including Dr. Whitley's opinion; (2) update the record with any available records from treating sources and obtain additional evidence concerning the claimant's medical condition in order to complete the administrative record, including a consultative mental status examination with psychological testing and medical source statements about what the claimant can still do despite the impairments; (3) further evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. § 426.920a; (4) re-assess the claimant's maximum residual functional capacity on a function-by-function basis; and (5) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Tr. 87).

Upon remand, the claimant appeared and testified at a hearing held on January 22, 2010. Robert H. Ballantyne, an impartial vocational expert, also appeared at the hearing. On April 23, 2010, the ALJ[2] found that the plaintiff was not under a disability as defined in the Social Security Act. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 11, 2011. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant has not engaged in substantial gainful activity since April 18, 2005, the application date (20 C.F.R. § 416.971 *et seq*.).

---

[2]The April 23, 2008, and April 23, 2010, decisions were issued by two different ALJs (*see* Tr. 27, 66).

2

2.  The claimant has the following severe impairments:  a mood disorder and borderline intellectual functioning (20 C.F.R. § 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled work at all exertional levels. However, the claimant is mildly limited in his ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decisions and make judgments on complex work-related decisions, moderately limited in his ability to understand and remember complex instructions and carry out complex instructions, and markedly limited in his ability to interact appropriately with the public, supervisors or co-workers and respond appropriately to usual work situations and to changes in a routine work setting. Therefore, the claimant is limited to simple, routine, low stress and unskilled work and mostly involving working with things instead of people.

5.  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.965).

6.  The claimant was born on May 3, 1986, and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

3

8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. § 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act since April 18, 2005, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

4

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

5

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 18 years old when he filed his application, and he has an 11th grade education. He was in special education classes in school. He does not have any work experience that meets the standard of past relevant work.

On May 7, 1998, Sylvia Patterson, SPII, performed a psychoeducational evaluation of the plaintiff to determine the appropriateness of continued resource instruction and special services. Ms. Patterson noted that the plaintiff sometimes had inappropriate behavior in school but that was thought to result from academic frustration. Testing showed that the plaintiff had a full-scale IQ of 87, which is in the low average range. Academic achievement testing generally showed below average scores. Adaptive behavior, as judged by the plaintiff's teacher, was subaverage. Specific areas of concern included:

> – disrupts the work of others;
> – has difficulty attending to tasks;
> – fails classroom tests;
> – does not grasp basic concepts related to academics;
> – blames others for own failure;
> – does not obey teacher's directives;
> – performs daily academic tasks at failing level;
> – fails to disregard the consequences of own behavior;

6

– must have immediate gratification;
– doesn't follow directions related to academic tasks;
– responds inappropriately to conductive criticism from others;
– exhibits off-task behaviors;
– makes derogatory comments about others;
– responds too quickly to questions about academic tasks and
does not generalize academic skills to new or different tasks.

(Tr. 226-30).  Ms. Patterson stated that her assessment of the plaintiff was that he warranted continuation in special services as a learning disabled student.  Ms. Patterson also recommended a behavior modification program (Tr. 231).

On May 2, 2002, a Behavioral Intervention Plan was implemented for the plaintiff through the Lancaster County School District.  The plan was implemented in an effort to decrease "outbursts of anger" (Tr. 184-85).  On May 14, 2003, a plan review showed that the plaintiff was expelled from school.  The plan was kept in place for the following school year (Tr. 185).

The plaintiff had an initial assessment at the Catawba Community Mental Health Center on February 28, 2003.  The plaintiff was required to have "anger management" before returning to school.  The plaintiff's initial diagnoses were intermittent explosive disorder, disruptive behavior disorder, and a Global Assessment of Functioning ("GAF") score of 60, which indicated moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text revision 2000) (DSM-IV-TR).  The plaintiff was determined to be eligible for services and was set up for outpatient therapy (Tr. 201-205).

On May 15, 2003, an Individualized Education Program ("IEP") was developed for the plaintiff through the Lancaster County School District for learning disabilities.  It was noted that the plaintiff's "low skill level in reading and written language hinder his progress in regular education classes."  The plaintiff was assigned special accommodations including resource assistance and classroom modifications (Tr. 187-200).

7

On June 10, 2003, a physician's note from Catawba Community indicated that the plaintiff was not receiving medications from their facility. The plaintiff was evaluated for disruptive behavior disorder and advised to continue individual therapy to address coping and anger control (Tr. 206).

On March 24, 2004, the plaintiff underwent an IEP review, which showed that he "continue[d] to have a disability and needs special education and related services" (Tr. 207).

On May 15, 2004, the plaintiff had an updated IEP evaluation. It was noted that he had been on home instruction since September 2003, and his skill level had dropped in both reading and written language. The plaintiff was scheduled to be "outside regular class" in resource or special education at least 21% of the time but not more than 60% of the time. A behavioral intervention plan included mental health counseling for anger (Tr. 208-25).

On May 17, 2005, the plaintiff's learning disability instructor, Sheila Robertson, completed a Teacher Questionnaire (tr. 239-46). Ms. Robertson indicated that she had interacted with the plaintiff daily for 2½ years. The plaintiff's actual grade level was 11th, but he had a 4th grade reading level, 6th grade math level, and 5th grade writing level. In acquiring and using information, Ms. Robertson found the plaintiff had a "serious" problem in the following categories:

– reading and comprehending written material;
– providing organized oral explanations and adequate details;
– recalling and applying previously learned material; and,
– applying problem solving skills in class discussions.

Ms. Robertson stated, "Jay needs constant assistance when learning new material. He has difficulty paying attention and great difficulty accepting direction from teachers" (Tr. 240).

8

In attending and completing tasks, Ms. Robertson found the plaintiff had a "serious" problem in the following areas:

> – refocusing to tasks when necessary;
> – carrying out multi-step instructions; and,
> – completing work accurately without careless mistakes.

The plaintiff had a "very serious" problem with:

> – focusing long enough to finish assigned activity or task;
> – waiting to take turns;
> – changing from one activity to another without being disruptive;
> – completing class/homework assignments; and,
> – working without distracting self or others.

Ms. Robertson listed the frequency of these problems, as well as the plaintiff's "slight" and "obvious" problems, as "hourly."  Ms. Robertson stated,

> Jay was very disruptive in class displaying problems with anger toward peers and teachers on a daily basis. He found it very difficult to comply with a teacher's request. He also had a very serious problems with coaches in football and basketball 'telling him what to do' and was subsequently dismissed from both teams.

(Tr. 241).

In interacting and relating with others, Ms. Robertson found the plaintiff had the following "serious" problems:

> – relating experiences and telling stories;
> – using language appropriate to the situation and listener; and,
> – using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation.

The plaintiff had a "very serious" problem in:

> – seeking attention appropriately; expressing anger appropriately;
> – asking permission appropriately;
> – following rules, respecting and obeying adults in authority;
> – taking turns in a conversation; and,

> – interpreting meaning facial expression, body language, hints, and sarcasm.

All problems under this category were marked as occurring "hourly." Ms. Robertson stated,

> Jay had a behavior modification plan the entire time at LHS, going to the resource teacher, guidance counselor, and assistant principal when needed. He was also suspended many times and expelled. Jay was involved in a very aggressive fight that resulted in his expulsion from LHS.

(Tr. 242).

Ms. Robertson indicated that she could understand "almost all" of the plaintiff's speech and observed no problems with moving about and manipulating objects (Tr. 243). In caring for himself, Ms. Robertson indicated that the plaintiff had a "very serious" problem with:

> – handling frustration appropriately;
> – being patient when necessary;
> – using good judgment regarding personal safety and dangerous circumstances;
> – identifying and appropriately asserting emotional needs; responding appropriately to changes in mood; and,
> – using appropriate coping skills to meet daily demands of school environment.

Ms. Robertson rated the frequency of these problems as "daily." Ms. Robertson stated, "Anger management is Jay's biggest problem in my opinion. His skill levels are low, but he was never able to stay in a classroom to learn the material because of behavioral issues" (Tr. 244). Regarding medical conditions and medications, Ms. Robertson stated, "At one time, Jay was on medication to control his anger, but I am not aware of that situation now" (Tr. 245).

John C. Whitley, Ph.D., a psychologist, performed a consultative examination of the plaintiff on August 23, 2005 (Tr. 247-52). The plaintiff reported that he has a "bad attitude" and was quick tempered. He did not take any medication and was not currently receiving treatment. The plaintiff reported that he had difficulty with reading and math, but

10

he could follow directions. He organized his daily activities, cared for his home, and cared for himself appropriately. He stated he was able to cook simple foods and shop for food and clothing (Tr. 248). The plaintiff reported that he woke up around 8:00 in the morning, ate, got dressed, walked the dog, played video games, and exercised by lifting weights and playing basketball. He also watched television, did light cooking, and listened to music (Tr. 248).

On examination, Dr. Whitley found the plaintiff to appear his stated age, with a normal affect and pleasant, but irritable mood. His memory and concentration were grossly intact, and his thought processing was concrete and rational. Dr. Whitley administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III). The plaintiff had a full scale IQ of 76, which is in the borderline range (Tr. 249). Dr. Whitley noted that the plaintiff's verbal comprehension was extremely low and might impede his ability to learn new material. The plaintiff's nonverbal reasoning abilities were much better developed than his verbal reasoning abilities (Tr. 250-51). Dr. Whitley diagnosed the plaintiff with reading disorder, depressive disorder, NOS (not otherwise specified), alcohol abuse, cannabis abuse in full remission, and borderline intellectual functioning (Tr. 251). He rated the plaintiff with a GAF of 61, which represented mild symptoms or some difficulty with social, occupational, or school functioning. *See* DSM-IV-TR 34. Dr. Whitley opined that "because of his poor attitude [the plaintiff] may function best with solitary work tasks." He further stated that the plaintiff might require substance abuse treatment for alcohol. He concluded that the plaintiff appeared to have the ability to complete simple tasks in a timely matter, and the plaintiff would require assistance with management of financial issues (Tr. 251-52).

A Psychiatric Review Technique Questionnaire was completed by Lisa Klohn, PhD, on September 19, 2005. Dr. Klohn indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities, moderate difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration,

11

persistence, and pace. She also found no episodes of decompensation. Dr. Klohn found that the plaintiff's allegations were credible and his impairments were severe, but stated they "would not preclude unskilled work" (Tr. 163-76). On this same date, Dr. Klohn completed a Mental Residual Functional Capacity Assessment form, identifying the following categories as "moderately limited:"

> - the ability to understand and remember detailed instructions;
> - the ability to maintain concentration and attention for extended periods;
> - the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
> - the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and,
> - the ability to interact appropriately with the general public.

All other categories were marked "not significantly limited" (Tr. 177-80).

Chad Ritterspach, Psy.D., performed a consultative examination of the plaintiff on May 23, 2009 (Tr. 254-60). The plaintiff stated that he had anger management problems. He had not been compliant with prescribed treatment and stated that he was disabled because he did not like to be around a lot of people (Tr. 254). The plaintiff reported that he spent his day with his dogs and playing pool (Tr. 255). Despite his mood disturbance, the plaintiff could perform self care, prepare a simple meal, shop, drive, and engage in limited social activity (Tr. 250). He had limited reading and writing skills and difficulty following directions (Tr. 25).

During examination, Dr. Ritterspach observed that the plaintiff made appropriate eye contact and was oriented. He had an indifferent mood and normal affect. The plaintiff's thought processes were logical and grounded and were appropriate for mood and circumstances (Tr. 255). The plaintiff showed poor insight and impulsive judgment, but he had unimpaired memory and concentration (Tr. 250). After examination, Dr. Ritterspach

diagnosed the plaintiff with "mood disorder NOS - mixed, rapid cycling" and assigned the plaintiff a GAF of 45, indicating serious symptoms or serious impairment in social, occupational, or school functioning (Tr. 255).

> Dr. Ritterspach's conclusions were:
>
> JaMarcus Jermaine McIlwain, a twenty-three year old male, showed no signs of malingering. He presents with depressed and irritable mood that fluctuates rapidly depending on the circumstances, low motivation, social avoidance and physically aggressive behavior. He has below average verbal reasoning and mathematical skills. He has limited ability to ascertain the dangerousness of everyday situations and take the necessary action to avoid physical danger. He has very limited ability to understand, retain, and follow directions. He has limited ability to sustain to perform simple, repetitive tasks. He has below average ability to relate to others including fellow workers and supervisors, experiencing conflict in every setting – school and work – in which he has been in. He may have difficulties tolerating the mental stress and pressures associated with day-to-day work activity.

(Tr. 255).

In June 2009, Dr. Ritterspach completed a medical source statement of ability to perform work-related mental activities. He rated the plaintiff as having "moderate" limitations in his abilities to understand and remember simple and complex instructions, make judgments on simple work-related factors, interact appropriately with supervisors, and respond appropriately to usual work situations and changes in the work setting (Tr. 258-60). He found the plaintiff had "marked" limitations in his abilities to carry out simple and complex instructions, make judgments on complex work-related factors, and interact appropriately with the public or co-workers (Tr. 258-59). He further stated that it was probable that the plaintiff had suffered from these limitations since "middle childhood" (Tr. 259).

In October 2009, Lisa Bridgewater, Ph.D., performed a consultative examination of the plaintiff (Tr. 261-71). The plaintiff reported that he got angry very easily

(Tr. 263).  The plaintiff had no problems with personal care, made simple meals, and helped around the house, feeding the dogs and emptying the trash.  The plaintiff's mother did not ask him to do anything because of his response.  The plaintiff presented as irritated and withdrawn, tense, and edgy, but as the examination progressed, he became more relaxed and cooperative.  He had good eye contact and was oriented.  His mood appeared depressed and irritable, with a flat affect (Tr. 264).

Dr. Bridgewater administered the WAIS-IV (Tr. 261-62, 264).  She noted that while the plaintiff tested in the borderline range of intellectual functioning with a full scale IQ of 72, this was not truly representative of his cognitive ability because he had performed much better on non-verbal than verbal reasoning tasks (Tr. 265).  She diagnosed reading disorder, math disorder, disorder of written expression, rule out attention deficit hyperactivity disorder, mood disorder, NOS, with mixed features, and assigned him a GAF of 45 (Tr. 267-68).  Testing also showed that he had a 1st grade spelling level and a 2nd grade reading and math level (Tr. 265).

Dr. Bridgewater stated as follows:

> Based on his history and symptoms, it is very likely that Jamarcus had a history of attention deficit hyperactivity disorder which was not medicated or treated. As stated, he exhibits significant learning disabilities. He will be unable to follow written directions or engage in writing that would be needed in a work situation. Currently he reports mood swings, periods of depression alternating with periods of irritability and anger. He also reports difficulty sleeping. He has extreme difficulty controlling his impulses and acts out violently and aggressively in anger. At this point in time, he would likely be unable to initiate or sustain any kind of regular work because of his mood difficulties. His ability to respond to supervision and authority or to interact appropriately with coworkers and peers is extremely poor. It would be very beneficial for him to have a psychiatric evaluation and this was discussed with Jamarcus. Medication would likely help with his anger control.  There is some question in the examiner's mind of whether his impulsivity and acting up in anger could possibly be related to the head injury at the age of 3.  He will need help with any funds which he is awarded.

14

(Tr. 267).

Dr. Bridgewater also completed a medical source statement of ability to perform work-related mental activities. She rated the plaintiff as having "mild" limitations in his abilities to understand, remember, and carry out simple instructions and make judgments on simple and complex work-related decisions. She rated the plaintiff as having "moderate" limitations in his abilities to understand, remember, and carry out complex instructions (Tr. 269-71). She indicated that the plaintiff had "extreme" limitations in his abilities to appropriately interact with others and respond to usual work situations or changes in a routine work setting (Tr. 270). Dr. Bridgewater indicated that the factors supporting this assessment were "History of fights, aggressive behaviors, number of arrests due to same. Very little impulse control and poor ability to tolerate frustration" (Tr. 270).

The plaintiff appeared with a representative and testified at the January 2010 hearing before the ALJ (Tr. 281-302). He said he finished the 11th grade, attending special education classes (Tr. 281). The plaintiff testified that he tried working, but he did not get along with the other people and had been fired from at least two jobs (Tr. 282). He had been arrested within the past two years (Tr. 283). He testified to a number of altercations where he had been shot or hit on the head with a bottle (Tr. 285-86). The plaintiff testified that he could not work because he did not like to be around people (Tr. 293).

The plaintiff lived with his mother. He swept the floors, made beds, and emptied the trash (Tr. 297). He did not go grocery shopping, but he helped carry groceries into the house (Tr. 295). The plaintiff spent his time with his dog, playing video games with his brother and cousin, and shooting pool at a recreational center (Tr. 291-92). The plaintiff also went fishing with his stepfather (Tr. 299).

The plaintiff testified he spent time with his four-year-old son, whom he had custody of on weekends. His mother took care of his son, and the plaintiff kept him entertained (Tr. 289). The plaintiff's sister paid him to watch her children (Tr. 294). The

15

plaintiff's mother, Darlene Stinson, also testified at the hearing (Tr. 303-07). She said that her son had not gotten better in the past two years. He still had "attitude" and argued with her every time she asked him to do something (Tr. 304). He attended court-ordered anger management classes once a week (Tr. 305). Ms. Stinson testified that the plaintiff was not going out and getting into trouble (Tr. 306). She testified that the plaintiff would be with his son when he felt like it, but when he did not "need the baby," he would just leave the child with her (Tr. 306).

Robert Ballantyne testified as a vocational expert at the hearing (Tr. 308-10). The ALJ described to Mr. Ballantyne a hypothetical individual who was the same age as the plaintiff, with the same education and no past relevant work, with no exertional limitations, who could not perform any significant reading and writing, but could perform simple, routine, repetitive tasks in a low stress setting—with very little social demands—working with things as opposed to people. The ALJ asked Mr. Ballantyne whether any jobs existed that such a hypothetical individual could perform. Mr. Ballantyne testified that jobs existed and gave some examples, including jobs in the custodial field, car wash attendant, and landscape laborer (Tr. 309-10).[3] The plaintiff's counsel asked Mr. Ballantyne if, under the same hypothetical, the individual would be able to retain employment if he had extreme limitations in interacting with the public, co-workers, and supervisors and "extreme limitation in responding to changes in the routine or directions from the supervisor" (Tr. 310). The vocational expert responded that the hypothetical individual would not be able to perform the identified jobs or other work (Tr. 310).

---

[3] Custodial jobs - light exertion: cleaner (*Dictionary of Occupational Titles (DOT)* 323.687-014)(4,200 jobs in North Carolina); medium exertion (*DOT* 383.664.010(over 10,000 jobs in North Carolina). Car wash attendant (*DOT* 915.667-010)(1,100 jobs in North Carolina)(Tr. 309-10). Landscape laborer, medium work (*DOT* 406.687-010)(8,400 jobs)(Tr. 309-10)

## ANALYSIS

The plaintiff alleges disability commencing in April 2005, at which time he was 18 years old. He was 23 years old at the time the April 2010 ALJ hearing decision was issued. The plaintiff has an 11th grade education and was in special education classes in school. He does not have any work experience that meets the standards of past relevant work. The ALJ found that the plaintiff's mood disorder and borderline intellectual functioning were severe impairments. The ALJ further determined that the plaintiff could perform limited unskilled work at all exertional levels but was limited to simple, routine, low stress and unskilled work mostly involving working with things instead of people. The plaintiff argues the ALJ erred in (1) improperly evaluating the opinions of the examining physicians; (2) failing to properly consider the testimony of his mother; and (3) proposing an incomplete hypothetical to the vocational expert (pl. brief 17, 19, 37).

### *Medical Opinion Evidence*

The plaintiff argues that the ALJ improperly evaluated the opinions of examining physicians Drs. Bridgewater, Ritterspach, and Whitley. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

17

The ALJ found as follows with regard to Dr. Bridgewater's opinion:

> As for the opinion evidence I have given little weight to the opinion of the consultative examiner Dr. Bridgewater because I find that her conclusions are not supported by or consistent with the medical evidence of record. In addition, I find that Dr. Bridgewater's statements and conclusions are contradictory. Specifically, Dr. Bridgewater opined that the claimant would likely be unable to initiate and sustain any kind of regular work because of his mood difficulties. Moreover, Dr. Bridgewater opined that the claimant would be unable to follow written directions or engage in writing that would be needed for a work situation. However, when she completed the Medical Source Statement of Ability to do Work Related Activities (Mental) on the claimant, she reported that he only had mild limitations in his ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple instructions, carry out simple instructions, make judgments on simple work related decisions and make judgments on complex work related decisions and moderate limitations in his ability to understand and remember complex instructions and carry out complex instructions. . . .

> It would appear that Drs. Bridgewater['s] . . . conclusions are based on the information received from the claimant during the consultative examination considering the fact that the claimant has had no other interaction with any other examining or treating sources since August 23, 2005, when he was evaluated by Dr. Whitley who opined that the claimant appeared to have the ability to complete simple work tasks in a timely manner and that the claimant would function best in solitary work tasks.

(Tr. 25-26).

The plaintiff specifically argues that the ALJ erred in finding that Dr. Bridgewater's opinion was inconsistent with the record, he failed to sufficiently point out any inconsistencies, and his finding that Dr. Bridgewater's opinions were contradictory was inaccurate. As pointed out by the ALJ, Dr. Bridgewater's evaluation conclusions were not consistent with her contemporaneously rendered opinion as to the plaintiff's ability to perform work-related mental activities (Tr. 25; *see* 261-71). For example, Dr. Bridgewater's opinion that the plaintiff would be "unable to initiate and sustain any kind of regular work

because of his mood difficulties" and would be unable to follow written directions or engage in writing in a work situation was inconsistent with her evaluation finding that the plaintiff had only "mild" limitations in his abilities to understand, remember, and carry out simple instructions and make judgments on simple or complex work-related decisions (Tr. 25-26; *compare* Tr. 267 *with* Tr. 269). Further, Dr. Bridgewater's statement that the plaintiff would be "unable to initiate and sustain any kind of regular work" (Tr. 267), is not a medical source opinion. Instead, it is an administrative determination reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1).

In addition, Dr. Bridgewater's conclusions were also inconsistent with the plaintiff's own reports and Dr. Whitley's findings. The regulations permit an ALJ to consider the consistency of a medical opinion in determining the weight the opinion should be given. *Id.* § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). The plaintiff reported to Dr. Whitley that he organized his daily activities, cared for himself, cooked simple foods, shopped for food and clothing, walked the dog, played video games, and exercised by lifting weights and playing basketball (Tr. 24, 248). He further reported that he could follow directions, and he socialized with his family (Tr. 24, 248). After examination and testing, as noted by the ALJ, Dr. Whitley opined that the plaintiff could engage in simple and unskilled work tasks and would function best with solitary work tasks (Tr. 24, 26, 251-52). Dr. Whitley assigned the plaintiff a GAF of 61, which represented only mild symptoms or some difficulty with social, occupational, or school functioning (Tr. 251).

The plaintiff further argues that the ALJ should have recontacted Dr. Bridgewater if he found contradictions in her opinion. At the time of the ALJ's decision, the regulations provided that an ALJ should recontact a medical source when the evidence was "inadequate . . . to determine whether you are disabled." 20 C.F.R. §§ 404.1512(e),

416.912(e) (effective prior to March 25, 2012).[4]  Here, the evidence was not inadequate to make a determination.  Rather, the evidence did not support Dr. Bridgewater's evaluation conclusions.

The plaintiff also argues the ALJ did not understand Dr. Bridgewater's opinion. Specifically, the ALJ noted that Dr. Bridgewater "ruled out Attention Deficit Hyperactivity Disorder and diagnosed the claimant with a reading disorder, mathematics disorder, a disorder of written expression and a mood disorder" (Tr. 22).  In fact, Dr. Bridgewater actually diagnosed "Rule out attention deficit hyperactivity disorder, combined type" (Tr. 267), which indicated that such a diagnosis warranted further investigation.  She also opined that "it is very likely that Jamarcus had a history of attention deficit hyperactivity disorder that was not medicated or treated" (Tr. 267).  The ALJ made the inaccurate statement in his discussion of whether the plaintiff met the criteria of Listing 12.05 (Mental Retardation) at the third step of the sequential evaluation process (*see* Tr. 22).  Importantly, the plaintiff does not argue that he meets the listing.  Furthermore, even if he did make such an argument, substantial evidence supports the ALJ's finding that he does not meet Listing 12.05 (*see* Tr. 21-22 (citing the plaintiff's school records, IQ tests, and Dr. Whitley's evaluation as evidence that the plaintiff did not meet the listing). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.  Accordingly, this court finds that any error in this regard is harmless as the ALJ's finding is supported by other substantial evidence. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The plaintiff next argues that the ALJ erred in his evaluation of the opinion of Dr. Ritterspach.  The ALJ found that Dr. Ritterspach's conclusions - that the plaintiff had very limited abilities to understand, retain, and follow directions, and a limited ability to

_____

[4]The regulations were amended effective March 26, 2012, and this subsection was removed.

perform simple repetitive tasks - were not supported by or consistent with the medical evidence of record (Tr. 26).  The ALJ noted that, although the medical evidence demonstrated the plaintiff had difficulty getting along with others, it also demonstrated the plaintiff was able to think, communicate, and act in his own interest (Tr. 23).  The ALJ also noted that Dr. Ritterspach's conclusions were contrary to Dr. Whitley's findings that the plaintiff could engage in simple and unskilled work tasks and would function best with solitary work tasks (Tr. 24, 251-52).  As noted above, Dr. Whitley also assigned the plaintiff a GAF of 61, which represented only mild symptoms or some difficulty with social, occupational, or school functioning (Tr. 251).  Furthermore, the ALJ also pointed out that Dr. Ritterspach's conclusions appeared to be based on the plaintiff's self report (Tr. 26; *see also* Tr. 254-55).  Notably, Dr. Ritterspach's conclusions were inconsistent with the plaintiff's daily activities as reported to Dr. Whitley (Tr. 248).

The plaintiff also contends that the ALJ erred in failing to weigh Dr. Whitley's opinion.  In the decision, the ALJ set out Dr. Whitley's 2005 examination findings and opinion (*see* Tr. 24-25 (noting in his decision that while Dr. Whitley opined that the plaintiff's motivation to interact with others in an appropriate manner, his ability to cope with stress and change, and his ability to use appropriate judgment were poor, Dr. Whitley concluded the plaintiff had the ability to complete simple work tasks in a timely manner and would function best with solitary work tasks)).  While the ALJ did not state it explicitly, the residual functional capacity finding demonstrates that the ALJ gave weight to Dr. Whitley's opinion.  The ALJ's residual functional capacity determination is very similar to Dr. Whitley's opinion (*compare* Tr. 22 (Finding 4:  the plaintiff "is limited to simple, routine, low stress and unskilled work and mostly involving working with things instead of people) *with* Tr. 251-52 (the plaintiff is "able to engage in simple and unskilled work tasks," and "he may function best with solitary work tasks")).  As discussed above, the ALJ also compared the conclusions of Drs. Bridgewater and Ritterspach with Dr. Whitley's August 2005 findings

21

(Tr. 26 (citing Ex. 8F, Tr. 247-52)).  In sum, as argued by the Commissioner, the ALJ's decision demonstrates that he reasonably considered and weighed Dr. Whitley's opinion in the context of the record as a whole.

Based upon the foregoing, this court finds that the ALJ appropriately considered the medical opinions and substantial evidence supports his findings.

**Testimony of the Plaintiff's Mother**

The plaintiff claims that the ALJ erred by not addressing his mother's testimony.  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to

22

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c).

In making his credibility finding, the ALJ discussed the plaintiff's testimony and then noted that the plaintiff's mother, Ms. Stinson, appeared and testified at the hearing. The ALJ acknowledged that Ms. Stinson testified that the plaintiff participated in anger management classes once a week but she had not witnessed any improvement (Tr. 23). Thereafter, the ALJ determined that the plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (Tr. 22-24). The ALJ noted that the anger management classes the plaintiff was required to attend were "usually in conjunction with or associated with criminal offense of some sort and an attempt

to decrease the chances of one . . . being confined to a penal institution" (Tr. 24).[5]  The ALJ found it significant that the plaintiff did not receive any ongoing mental health treatment, he had no psychiatric hospitalizations, and he did not take any mental health medications (Tr. 23), all of which are appropriate considerations in evaluating credibility. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c).

Based upon the foregoing, this court finds that the ALJ appropriately considered the testimony of the plaintiff and his mother and reasonably determined that the statements regarding the nature and severity of his symptoms were not credible.

***Vocational Expert***

Lastly, the plaintiff argues that the ALJ failed to include all of his limitations in the hypothetical question to the vocational expert.  Specifically, the plaintiff argues the hypothetical did not adequately account for the ALJ's finding that the plaintiff was "markedly limited" in his ability to interact appropriately with the public, supervisors, or co-workers and to respond appropriately to usual work situations and to changes in a routine work setting (pl. brief 18-19).

As argued by the Commissioner, although Finding 4 of the ALJ's decision includes a list of "mild," "moderate," and "marked" limitations, the ALJ specifically explained in this finding that because of these limitations, he determined that the plaintiff was "limited to simple, routine, low stress and unskilled work and mostly involving working with things instead of people" (Tr. 22).  In assessing the plaintiff's mental abilities, the ALJ first assessed the nature and extent of the plaintiff's mental limitations and restrictions and then determined his residual functional capacity for work on a regular and continuing basis. *See* 20 C.F.R. § 416.945(c).  The ALJ presented the vocational expert with a hypothetical individual who had the same residual functional capacity as the plaintiff (*compare* Tr. 22

---

[5]In fact, both the plaintiff and his mother testified that the plaintiff was required to attend the classes after being arrested for criminal domestic violence (*see* Tr. 283-84, 305).

24

(simple, routine, low stress and unskilled work and mostly involving working with things instead of people) *with* Tr. 309 (hypothetical individual who could not perform any significant reading and writing, but could perform simple, routine, repetitive tasks in a low stress setting - with very little social demands - working with things as opposed to people)).  The vocational expert testified that jobs existed and gave examples such as a cleaner, janitor, car wash attendant, and landscape laborer (Tr. 309-10).

"[A] hypothetical question is unimpeachable if it 'adequately reflect[s]' a residual functional capacity for which the ALJ had sufficient evidence." *Fisher v. Barnhart*, 181 Fed. Appx. 359, 364 (4th Cir. 2006) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005)).  Further, "the ALJ has some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do." *Id.*  Here, the ALJ's hypothetical question fairly conveyed the plaintiff's functional capacity to the vocational expert.  Accordingly, the allegation of error is without merit.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 14, 2013
Greenville, South Carolina